Nott, J.,
delivered the opinion of the court:
Three has grown up in this court a u mischievous practice,” as it would have been termed by the earlier judges of the common law; and it consists in a party, after he has once taken the deposition of his witness, recalling him, and without leave of the court, or cause, or excuse shoAvn, reexamining the same *335 witness upon tbe same subject-matter. This practice lias been sometimes alluded to by the court, and with disapprobation; but as no objection has ever been raised by the opposite party, there has been nothing to call forth a direct decision. The present case, however, does require judicial notice, and for a reason that might have been apprehended — that the second deposition of a witness flatly contradicts the first.
At nisi prius the rule is well understood, and I apprehend is universally adhered to, that a party must exhaust his examination in chief before he dismisses his witness. It is within the discretion of the court to allow the witness to be recalled, or his examination,in chief resumed; but when one or the other is allowed, it is a privilege and not a right. The privilege, moreover, is not granted as of course, but only where a satisfactory reason is assigned, and in furtherance of truth and j ustice.
Where the testimony of a witness is taken on written interrogatories there is not the same strict application of the rule, for counsel framing such interrogatories for a distant and unseen witness cannot be held to anticipate everything that he will say or omit to say; and witnesses will not understand the formal written interrogatories, nor gather their thoughts and memories together as under the pressure of an oral examination. Yet here the reexamination is not of course, and the court allowing it should be satisfied that it is sought to supply unintended defects, and not to alter what was deliberately uttered. The case of Ranney et al. v. Weed et al. (1 Barb., S. C. R., p. 220) is a case in point. The defendants moved ufor leave to issue anew commission to reexamine one of the same witnesses examined under a former commissionP They placed their motion upon the ground that the witness “ toould now he able to testify more definitely than heforeP But the Supreme Court of New York refused to issue the commission, and through an eminent judge said:
“ Per EDMONDS, J.: With full knowledge on the part of the defendants as to what the witness could testify to, they issued their commission, framed their interrogatories, and obtained the witness’s answer; and now, without any suggestion that their witness had made any mistake, or that any new evidence had been discovered, but merely on the expectation that he may now swear somewhat stronger on a point upon which he *336 bas been already examined, tbe motion is to have the witness reexamined. That ought not to be allowed; the practice would be fraught with too much danger.7’
There is a third form of examination, where the witness is subjected indeed to oral examination, but where it is out of court, at a distance, and by counsel employed for that purpose, who knows little of the facts of the case. In such instances it would be rigorous to hold parties strictly to the rule of nisi prius. Courts, on the contrary, will incline to the more relaxed practice appertaining to an examination on written interrogatories.
In this court, where all testimony is taken by deposition, an order is always entered by the clerk for the taking of testimony as of course, (Eule XX.) No application to the court for an order in the instance of every witness who is to be examined is necessary. The examination of a witness before a commissioner is the usual,'established practice, and is a right; but when the right is exercised it is exhausted.
Should a party find it necessary to reexamine a witness, he ought to apply for leave to the court. Should he neglect to apply, he must take the risk of his second deposition being excluded. Should no such permission have been sought, the court will still exercise its discretion as to admitting the second deposition if it is objected to at the trial.
The case now before us is a suit brought to recover the net proceeds of one hundred and sixteen bales of cotton captured in Mississippi. The principal question is that of ownership. On the former trial the court was unable to reach a conclusion, and remanded the case under the following decision r
u Per CURIAM: After long and careful consideration we find the proofs in this case so defective and vague upon points in which, in the nature of things, there must be clear and definite evidence, that we have been unable to reach any satisfactory conclusion. We therefore send the case back that the parties, if they choose, may furnish other testimony on the following points: 1. When the transfer of the cotton was made to the claimant. 2. What was the consideration for the transfer. 3. When the claimant arrived at the age of twenty-one, or was first legally married.”
Upon this question of ownership the chief witness for the claimant on the former trial, as on this, was her mother, she being also the vendor of the captured cotton. Since the former *337 trial she bas been reexamined by tbe claimant on the precise point as to which she previously testified — the sale or transfer of the property. Both examinations were oral, and at both counsel for the respective parties attended. On the first of these the witness testified positively that the cotton was moved from her plantation to Kingston to keep it from being destroyed; and that u it was witness’s cotton when it was moved to Kingston.” On her reexamination, two years later, she testifies, “The sale to my daughter toolc place before it toas talcen to Kingston.” The two statements are utterly irreconcilable, and the context of each indicates that the witness said what she then meant.
This time of the alleged sale is an important element in the case; for if the sale took place before the cotton was transferred to Kingston, there are shown certain acts of the claimant which may be regarded as acts of ownership; if, on the contrary, the sale did not take place till after the transfer to Kingston, these acts can be deemed nothing more than the assistance which a daughter would naturally lend to her mother. The importance of the fact was as apparent on the first trial as on this, and if it existed the responsibility rested upon the parties to establish it then. On this, the second trial, they indeed produce, the testimony of a second witness, a servant girl fourteen years of age when the transaction took place, who, nearly eight years afterward, essays to fix positively the precise time. Without throwing discredit upon the testimony, we think the witness could not have known so much as the parties themselves; and that the vendor must have known better when and what she did than a chance listener of her mistress’s conversation. We come back, therefore, to the testimony of Mrs. Mitchell as the only light by which we can here be guided. She having been reexamined by the claimants without the leave of the court, the second examination in chief going to the same subject-matter as to which the first went, no excuse for or explanation of the discrepancy being vouchsafed, and the later testimony of the witness being entirely overthrown by the earlier, we think that it cannot avail the claimants anything. From the first statement of the witness and from the other testimony in the case we deduce the following ultimate facts:
I. The claimant, Eliza Jane Mahan, never gave aid or com *338 fort to the late rebellion, and consistently adhered to the United States.
II. The claimant, Bichard H. Mahan, voluntarily resided Avithin the insurrectionary district during the late rebellion, and has not established to the satisfaction of the Court of Claims the facts that he never gave aid or comfort to the rebellion, nor that he consistently adhered to the United States.
III. The claimants were married in the month of March, 1865, being then residents within the State of Mississippi, and citizens thereof.
IY. The captured property described in the petition, consisting of one hundred and sixteen bales of cotton, was not raised, ginned, or baled by the claimant, Mrs. Mahan, as alleged in the petition. But, on the contrary, it was raised, ginned, and baled by James H. and Sophia G. Mitchell, upon a plantation known as Palatine Hills, in the State of Mississippi, where they resided. A life estate and the possession of this plantation were in Mrs. Mitchell; the remainder in Mrs. Mahan. Mrs. Mitchell is the mother of Mrs. Mahan, and James H. Mitchell was her step-father, and the plantation had been the property of Mrs.- Mitchell’s first husband, the claimant’s father. James H. Mitchell died in 1862, and Mrs. Mitchell was the ad-ministratrix of his estate. During the minority of the claimant,' Mrs. Mahan, Jamos H. Mitchell had acted as her guardian, receiving the profits of her estate, so that he became indebted to her in the sum of $24,701 46. To secure this indebtedness, he and Mrs. Sophia G. Mitchell duly executed to Mrs. Mahan, then Eliza Jane Mitchell, a certain mortgage, bearing date the 23d day of February, 1841, whereby they conveyed to her the Palatine Hills plantation, with certain personal property therein enumerated and described, upon the express condition, never-, theless, “ that, if the said James H. Mitchell, party of the first part, his heirs, executors, or administrators, shall well and truly j>ay, or cause to be paid, to the said Eliza Jane Mitchell, party of the second part, her heirs, the just and full sum of twenty-four thousand seven hundred and one dollars and forty-six cents, with legal interest from the date of these presents, on or before the period that the said Eliza Jane Mitchell shall arrive at the age of twenty-one years, or shall be legally married, or the said James H. Mitchell shall be called upon to make said payment in due course of law, which said sum of money *339 tbe said. James H. Mitchell owes to the said Eliza Jane Mitchell on his account, as her guardian, duly appointed, then these presents shall cease and determine, and be nuil and void.”
During the year 1842, the claimant, Mrs. Mahan, was married to her first husband, P. K. Nicholls, but the mortgage was not then paid, nor has it since been paid, neither principal nor interest.
In December, 1862, the Confederate general, Yan Dorn, issued an order requiring all cotton near the Mississippi to be removed to at least ten miles from the river, otherwise it should be burned, to prevent its capture by the United States forces. In compliance with this order, Mrs. Mitchell removed the cotton to Kingston, near Natchez, where it was stacked and covered.
After the death of James H. Mitchell, and after the cotton had been thus removed to Kingston, but before the capture of Natchez by the United States forces, and before the passage of the Abandoned or captured property act, á parol agreement was made between Mrs. Mitchell and Mrs. Mahan, to the effect that the latter should take the cotton as a payment upon the mortgage before described. The price was fixed at twenty cents per pound, but the number of pounds was not definitely ascertained; -neither was any payment endorsed upon the mortgage, nor any receipt given, nor any memorandum in writing made, nor any present consideration paid. Neither did any change of possession take place, nor was there any delivery, actual or symbolic. The cotton remained at Kingston until its seizure by the military forces of the United States; immediately upon which the claimant asserted that she ivas the owner and sought to procure its release. Mrs. Mitchell, the vendor, had been guilty of giving aid and comfort to the rebellion.
Y. After the capture of the cotton it was turned over to the Treasury agents and sold, and the net proceeds are now in the Treasury.
From these facts, we think, there, cannot be deduced those elements of a sale and delivery which constitute the ownership of personal property. Whether a gift inter vivos, or a grant-from parent to child in consideration of natural love and affection, would be sufficient to transfer property from a disloyal to a loyal citizen as against the subsequent capture of the United States, it is not necessary now to inquire; neither the one nor the other is pretended here. The party relies upon a purchase *340 and sale at which, so far as the evidence shows, she paid no money, relinquished no right, released no debt, assumed no-responsibility, and acquired no possession. The intent of the-parties was not evidenced by the payment of the purchase-money, nor by the ascertainment of the price, nor by a receipt upon the mortgage, nor by a written memorandum between the parties, nor by any formal or decisive declaration before-witnesses, nor by the delivery of the thing sold. The facts do not in law establish a sale and delivery, and the evidence to prove the ownership of the captured property fails.
The judgment of the court is that the petition be dismissed..
Loring-, J., dissented.